UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

       Case No. 16-cr-20460

       HON. MARK A. GOLDSMITH

EDWIN MILLS, et al.,

       Defendants.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT EDWIN MILLS'S MOTION TO SUPPRESS EVIDENCE**
**REGARDING MARCH 25, 2016 TRAFFIC STOP (Dkt. 662)**

This matter is before the Court on Defendant Edwin Mills's motion to suppress all evidence acquired during a traffic stop on or about March 25, 2016 (Dkt. 662). The Government filed a response in opposition to the motion (Dkt. 706), to which Mills replied (Dkt. 744).[1] For the reasons stated below, the Court denies the motion.

**I. BACKGROUND**

A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. See generally 2d Superseding Indictment (Dkt. 292).[2] That indictment claims that Defendants were members and associates of a criminal enterprise—the "6 Mile Chedda Grove" street gang in

---

[1] Because oral argument will not aid the Court's decisional process, Mills's motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

[2] Nine of the eleven defendants have since pleaded guilty. These nine defendants include Mario Jackson, Michael Richardson, Corey Mills, Devontae Russell, Phillip Peaks, Patrick Johnson, Lomnil Jackson, Donell Thompson, and Robert Baytops.

1

Detroit—one of whose purposes was to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of violence." Id. at 2, 6. The enterprise purportedly operated on the east side of Detroit within an area bordered roughly by East McNichols Road to the north, Kelly Road to the east, Houston-Whittier Street to the south, and Chalmers Street to the west. Id. at 2. The "Chedda Grove" part of the enterprise's name is partially derived from one of the main streets in this territory—Cedargrove Street. Id.

The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. Id. at 5. The sale and distribution alleged were not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. Id.

Defendant Edwin Mills has been charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) (Count Eight involves victim A.T.; Count Ten involves victim S.H.); two counts of using and carrying a firearm during and in relation to a crime of violence causing death in violation of 18 U.S.C. §§ 924(c) and 924(j) (Count Nine involves victim A.T.; Count Eleven involves victim S.H.); two counts of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) (Count Twelve involves victim M.A.; Count Thirteen involves victim T.M.); and one count of using, carrying, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count Fourteen, based on Counts Twelve and Thirteen). See generally 2d Superseding Indictment. On March 1, 2018, the Government filed its notice of intent to seek a sentence of death against Mills and co-Defendant

Carlo Wilson (Dkt. 293). Defendants' trial is set to begin on April 21, 2020. See 8/31/2018 Order at 3 (Dkt. 475).

For purposes of the present motion, the facts surrounding the traffic stop on March 25, 2016, are from an opinion issued by Judge Gershwin A. Drain in this District following an evidentiary hearing in an unrelated case involving Defendant Lomnil Jackson.

> On March 25, 2016, Defendant [Lomnil Jackson] and two friends went to the Erotic City nightclub. The nightclub is located on Conant and 7 Mile Road in the City of Detroit. [Detroit Police] Officer Adnan Balija testified that Erotic City is known to be a magnet for violence, including assaults and shootings in the parking lot, as well as other nefarious activity. After midnight on March 25, 2016, Officer Balija and his partner, Jamarian Holloway, were on routine patrol when they received a call for assistance at Erotic City. Both officers were assigned to the Tactical Response Unit, which is a specialized unit that works in high crime areas. Balija has been a police officer for five years and Holloway has worked as a police officer for seven years. After they were directed to provide assistance at the club, they set up surveillance from their scout car where they could observe the parking lot.
>
> During the hearing Jasmine Coates, Defendant's good friend, testified that she arrived at the nightclub after midnight to give Defendant and her boyfriend, "Bush," a ride home because the key to their vehicle was broken. Coates testified that Bush became angry when she would not let him drive her vehicle. She believed he was too intoxicated to drive. The two exchanged verbal and physical blows. Defendant intervened and separated Coates and Bush. The officers observed this physical altercation in the parking lot and made contact with the participants in the fight. They advised everyone to go to their cars. Defendant claims that one of the officers conducted a pat down search and did not recover any contraband from him. Both officers deny conducting a pat down search of Defendant.
>
> After the officers told everyone involved in the milieu fight to go [to] their cars, they proceeded to their scout car. The officers exited the parking lot and parked their car directly across the street where they continued to observe the nightclub's parking lot. At that vantage point, they observed Defendant return to the front entrance of the club and begin arguing with someone. They both claim they witnessed Defendant clutching his waistband before he entered the passenger side of a white Chevrolet Malibu.
>
> The Malibu was driven by Dericka Knight, who was involved in an intimate relationship with Defendant. Also, in the car were Knight's friend[s], Danielle Bishop and Edwin Mills. The officers observed Knight fail to use her signal when she made a right turn onto Cona[n]t street. The officers conducted a traffic stop at a well lit Mobil gas station, located less than a half-mile from the nightclub. The

>officers called for backup for what they referred to as "moral support." Officer Holloway testified because there were four occupants in the car and only two of them, they requested other officers to assist during the stop.
>
>The officers exited their vehicle and approached the Malibu. Officer Balija approached the driver's side and Officer Holloway approached the passenger side of the vehicle. As the officers approached the car, they observed Defendant make motions towards the floorboard.
>
>Knight immediately informed Balija that she was a concealed pistol license ("CPL") holder and had a gun in her purse. Simultaneously, Officer Holloway illuminated the floorboard on the front passenger side where he observed a holstered 9mm handgun. He alerted Officer Balija to the presence of a firearm and ordered Defendant out of the car. He put Defendant in handcuffs and placed him in the back of the scout car.
>
>After all of the occupants exited the vehicle, Officer Balija went to the passenger seat and used his flashlight to recover the handgun observed by Officer Holloway. While Holloway testified that he saw the handgun on the floorboard, between the Defendant's legs, Officer Balija testified that he recovered the 9mm handgun from underneath the front passenger seat. The gun was loaded with seventeen live rounds.
>
>The officers also learned that the other female passenger, Danielle Bishop, had a CPL and had a firearm in the glove compartment. The officers determined that the 9 mm handgun did not belong to the occupants who had CPLs and when Defendant could not produce a CPL for the handgun, he was placed under arrest. The officers did not issue a traffic citation to Knight for failing to use her signal. The grand jury charged him with being a felon in possession of a firearm.

United States v. Jackson, No. 16-20249, Op. & Order at 2-5 (Sept. 16, 2016) (Drain, J.), Ex. A to Gov't Resp. (Dkt. 706-2).

Although Mills claims that he is entitled to an evidentiary hearing and casts doubt on the evidence Judge Drain relied on in concluding that the driver of the vehicle did not use her turn signal when exiting the club's parking lot, see Def. Mot. at 2 & n.1, he does not appear to dispute any of the relevant factual findings in Judge Drain's opinion denying Jackson's motion to suppress. Indeed, Mills fails to direct this Court to any disputed facts that would require an evidentiary hearing in this case. More importantly, Mills never contends that the driver of the Malibu did, in

4

fact, use her signal when turning onto Conant Street. Because resolution of the present motion requires addressing a purely legal issue, the Court finds that an evidentiary hearing on Mills's motion is not necessary.

## II. DISCUSSION

Mills argues that he was unconstitutionally seized in violation of the Fourth Amendment when the officers' performed the traffic stop because Michigan law does not require the operator of a vehicle to use of a turn signal when exiting a business's parking lot onto a street. Mills also argues that the officers' mistaken belief that the law required the use of a signal was not objectively reasonable and, therefore, all evidence derived from the traffic stop must be suppressed. The Court disagrees.

**A. Mills, as a Passenger of Vehicle, may Challenge the Constitutionality of Traffic Stop**

A threshold issue raised by the Government is whether Mills has "standing" to challenge the search and seizure of the vehicle. See Gov't Resp. at 4-6.[3]

The Fourth Amendment to the U.S. Constitution guarantees people the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has repeatedly emphasized, this Amendment "protects people, not places." Katz v. United States, 389 U.S. 347, 351 (1967); see also Rakas v. Illinois, 439 U.S. 128, 134 (1978)

---

[3] Despite the pervasive use of the term "standing" in opinions, it should be noted that the Supreme Court has rejected the concept of standing in the context of the Fourth Amendment. See Rakas v. Illinois, 439 U.S. 128, 139-140 (1978). Rather, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas, 439 U.S. at 140); accord United States v. Britton, 335 F. App'x 571, 574 (6th Cir. 2009); United States v. Smith, 263 F.3d 571, 581-582 (6th Cir. 2001); United States v. King, 227 F.3d 732, 743 n.1 (6th Cir. 2000).

5

("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Thus, Fourth Amendment rights are considered "personal rights," and they cannot be vicariously asserted. United States v. Noble, 762 F.3d 509, 526 (6th Cir. 2014) (citing Alderman v. United States, 394 U.S. 165, 174 (1969)). This means that a defendant seeking to suppress evidence "must demonstrate that he or she personally has an expectation of privacy in the place searched, and that the expectation is reasonable." Id. (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)).

The Sixth Circuit has repeatedly held that a passenger with no possessory interest in a stopped vehicle lacks a sufficient Fourth Amendment privacy interest to challenge the validity of a subsequent search of that vehicle. See, e.g., United States v. Bah, 794 F.3d 617, 626 (6th Cir. 2015) (holding that the defendant did not have standing to directly contest the legality of the vehicle search on Fourth Amendment privacy grounds because he had no possessory interest as a passenger in a rental vehicle); United States v. Torres-Ramos, 536 F.3d 542, 549 (6th Cir. 2008) ("We agree that Rakas controls this particular issue and that the defendants did not have a reasonable expectation of privacy [as passengers] in the van."); United States v. Ellis, 497 F.3d 606, 612 (6th Cir. 2007) (recognizing that "a passenger does not have a legitimate expectation of privacy in the searched vehicle"). Here, Mills does not claim to have any property or possessory interest in the Malibu.

Nevertheless, passengers of vehicles may still challenge the constitutionality of their seizure and seek to suppress evidence discovered during an ensuing vehicle search as fruits of illegal activity. Brendlin v. California, 551 U.S. 249, 251 (2007); Bah, 794 F.3d at 626; Torres-Ramos, 536 F.3d at 549; Ellis, 497 F.3d at 612; see also United States v. Campbell, 549 F.3d 364,

371 (6th Cir. 2008) ("Not only the driver of a stopped vehicle, but a passenger as well, is seized within the meaning of the Fourth Amendment and thus may challenge the legality of the stop."). Whether the seizure of Mills was constitutionally permissible turns on whether the traffic stop performed on March 25, 2016 was lawful. Bah, 794 F.3d at 626. The traffic stop was undoubtedly lawful if the Detroit Police officers had probable cause at the time of the stop.

### B. Detroit Police Officers Made, at Most, an Objectively Reasonable Mistake of Law

"It is well-established that where an 'officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment.'" United States v. Winters, 782 F.3d 289, 298 (6th Cir. 2015) (quoting United States v. Bradshaw, 102 F.3d 204, 210 (6th Cir. 1996)); see also United States v. Lambert, 770 F. App'x 737, 739 (6th Cir. 2019) ("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction [for example, a traffic violation] or reasonable suspicion of criminal activity."); but see Heien v. North Carolina, 574 U.S. 54; 135 S. Ct. 530, 536 (2014) (to justify a traffic stop for a suspected violation of law, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." (quoting Navarette v. California, 572 U.S. 393, 396 (2014))). Thus, the March 25, 2016 traffic stop for a civil infraction was lawful if the Detroit Police officers had "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion" that the driver of the Malibu had committed or was committing a traffic violation at the time of the stop. United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993) (en banc).

Under the Michigan Vehicle Code, "[t]he operator of a vehicle . . . upon a highway, before stopping or turning from a direct line, shall first determine that the stopping or turning can be made in safety and shall give a signal as required in this section." Mich. Comp. Laws § 257.648(1).

7

Failing to signal as required under this section constitutes a civil infraction. Mich. Comp. Laws § 257.648(6). The Michigan Vehicle Code also provides that the "words and phrases" used in the Code shall "have the meanings respectively ascribed to them in this chapter." Mich. Comp. Laws § 257.1. Although the phrase "[h]ighway or street" has a specific definition for purposes of the Motor Vehicle Code, see Mich. Comp. Laws § 257.20 (defining phrase as "the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel"), the word "highway" itself is not defined.[4]

Mills argues that the entrance-exit driveway of Erotic City's fenced surface parking lot does not constitute a "highway" for purposes of section 257.648(1), and, therefore, the driver of the Malibu was not required to signal before turning onto Conant Street when exiting the parking lot. See Def. Mot. at 2, 4. And because the driver did not have to use a turn signal, there was no violation of Michigan law for which the officers could initiate the traffic stop. Id.

---

[4] Mills seems to suggest that the word "highway" in section 257.648(1) must be given the same definition as the phrase "highway or street" in section 257.20, as opposed to any other meaning. See Def. Mot. at 3-4; Def. Reply at 3 ("[W]ith due respect to the Michigan Court of Appeals, the word 'highway' has been defined by the Legislature with respect to the operation of automobiles." (citing Mich. Comp. Laws § 257.20)). While section 257.20 might be instructive for purposes of statutory interpretation, the Court notes that section 257.648(1) does not actually include the particular phrase "highway and street." Indeed, the Michigan Vehicle Code has several other definitions for phrases that also include the word "highway." See, e.g., Mich. Comp. Laws § 257.26 (defining the phrase "[l]imited access highway" as "every highway, street, or roadway in respect to which owners or occupants of abutting lands and other persons have no legal right of access to or from the same except at such points only, and in such manner as may be determined by the public authority having jurisdiction over such highway, street or roadway"); Mich. Comp. Laws § 257.28 (defining "[t]hrough highway" as "every state trunk line highway, or, any other highway at the entrance to which vehicular traffic from intersecting highways is required by law to stop before entering or crossing the same."); see also Mich. Comp. Laws § 257.64 (defining the phrase "[s]treet or highway" as "the entire width between boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel").

Even if Mills is correct that the driver of the Malibu was not required to use her turn signal under section 257.648(1), this does not necessarily mean that suppression of any evidence derived from the traffic stop is warranted.

In Heien, the Supreme Court emphasized that the Fourth Amendment requires seizures to be "reasonable," but that "[t]o be reasonable is not to be perfect." 135 S. Ct. at 536. Rather, "the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" Id. (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). Therefore, if an officer's mistake of law is objectively reasonable, there is no Fourth Amendment violation. Id. at 539 ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must be objectively reasonable.").

Assuming section 257.648(1) does not require the use of a turn signal when exiting a parking lot onto a street, the Court finds that the Detroit Police officers had an objectively reasonable, but mistaken, belief that the failure to use a turn signal was a violation of Michigan law.

Although the Michigan Supreme Court has neither interpreted the word "highway" in section 257.648(1) nor addressed its applicability to a vehicle exiting a business's parking lot onto a street, other courts have interpreted the word "highway" rather broadly. For example, in People v. Seabrooks, No. 212293, 2000 WL 33534569, at *1 (Mich. Ct. App. Feb. 11, 2000) (per curiam), the Michigan Court of Appeals held that the defendant had violated section 257.648(1) when he failed to use his signal when turning from an alley onto a street. In reaching that conclusion, the court interpreted the word "highway" in section 257.648(1) to include "all of the various kinds of public ways." Id. (emphasis added); accord In re Petition of Carson, 107 N.W.2d 902, 903 (Mich.

1961) ("Every public thoroughfare is a highway."). This expansive definition demonstrates the ambiguity of section 257.648(1). See Heien, 135 S. Ct. at 540 (the language of the relevant provision was ambiguous, and, because of the ambiguity, the officer's mistake—believing that all brake lights must be functioning instead of just one—was reasonable). Given this statutory ambiguity, the Detroit Police officers could have reasonably concluded that a signal was required by the law when the Malibu exited the driveway and entered onto Conant Street.

The reasonableness of their action is confirmed when considering the underlying purpose of requiring the use of turn signals under section 257.648(1), which "is to provide notice of movements along the route that could affect other motorists." People v Hrlic, 744 N.W.2d 221, 225 (Mich. Ct. App. 2007). A vehicle turning from a parking lot onto a highway undeniably affects other motorists' decisions and course of travel. Thus, the use of turn signals in those situations furthers the statute's public-safety purpose.

This case is remarkably similar to Garnett v. Warden, Noble Correctional Institution, No. 2:11-cv-00765, 2012 WL 600732, at *4-5 (S.D. Ohio Feb. 23, 2012), in which a police officer performed a traffic stop after the defendant turned left out of a convenience store parking lot onto a street without using a turn signal. The section of the Columbus City Code at issue in that case provided that "[n]o person shall turn a vehicle or move right or left upon a street or highway unless and until such person has exercised due care to ascertain that the movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided." Id. at *4. Like Mills, the defendant argued that he was not required to use a turn signal because he turned from private property onto a street, and, therefore, the officer lacked any constitutionally permissible basis for stopping his vehicle. Id. at *5. The court avoided the issue of statutory

interpretation, holding instead that the officer made an objectively reasonable mistake of law when he performed the traffic stop.  Id.

For all these reasons, the Court finds that the Detroit Police officers had reasonable grounds to believe that the driver of the Malibu had committed a civil violation at the time of the traffic stop.  Although the officer's belief about what constitutes a "highway" under section 257.648(1) for purposes of using a turn signal may have been mistaken, any such mistake was objectively reasonable.  Therefore, the traffic stop was lawful and did not violate the Fourth Amendment.

### III.  CONCLUSION

For the reasons stated above, Mills's motion to suppress all evidence obtained during a traffic stop performed on March 25, 2016 (Dkt. 662) is denied.

SO ORDERED.

Dated: August 15, 2019  
    Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge